## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MATTHEW CRANDALL, Individually and on Behalf of all Others Similarly Situated,<br><br>        Plaintiff,<br><br>        v.<br><br>PTC INC., JAMES HEPPELMANN, JEFFREY GLIDDEN, ANDREW MILLER, PRICEWATERHOUSECOOPERS LLP, RENATO ZAMBONINI, ROBERT P. SCHECHTER, MICHAEL E. PORTER, PAUL A. LACY, THOMAS BOGAN, DONALD K. GRIERSON, C. RICHARD HARRISON, and JANICE CHAFFIN,<br><br>        Defendants. | **Case No.:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff, Matthew Crandall ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PTC Inc. ("PTC" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired PTC securities between November 24, 2011 and July 29, 2015, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and directors.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, purchased PTC securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.      Defendant PTC designs, manufactures, and sells Product Lifecycle Management Systems software (i.e., software that manages a company's products from design through manufacturing and distribution) and maintains operations in the Americas, Europe, and Asia Pacific, including China. The Company is incorporated in Massachusetts with principal executive offices located at 140 Kendrick Street, Needham, MA 02494. PTC's common stock trades on the NASDAQ under the ticker symbol "PTC".

8.      Defendant PricewaterhouseCoopers LLP, a USA partnership, was PTC's independent auditor throughout the Class Period.

9.      Defendant James Heppelmann ("Heppelmann") has been a director of PTC throughout the class period and has been the President and Chief Executive Officer ("CEO") of PTC since October 2010.

10.     Defendant Jeffrey Glidden ("Glidden") was the Executive Vice President and Chief Financial Officer ("CFO") of PTC from September 2010 until February 5, 2015.

11.     Defendant Andrew Miller ("Miller") has been the Executive Vice President and CFO of PTC since February 5, 2015.

12.     Defendant Renato Zambonini ("Zambonini") was a director of the Company during the Class Period.

13.     Defendant Robert P. Schechter ("Schechter") was a director of the Company during the Class Period.

14.     Defendant Michael E. Porter ("Porter") was a director of the Company during the Class Period.

15.     Defendant Paul A. Lacy ("Lacy") was a director of the Company during the Class Period.

16.     Defendant Thomas Bogan ("Bogan") was a director of the Company during the Class Period.

17.     Defendant Donald K. Grierson ("Grierson") was the Chairman of the Board of Directors and a director of the Company during the Class Period.

18.     Defendant C. Richard Harrison ("Harrison") was the Chairman of the Board of Directors and a director of the Company during the Class Period.

19.     Defendant Janice Chaffin ("Chaffin") was a director of the Company during the Class Period.

20.     Defendants Heppelmann, Glidden, Miller, Chaffin, Harrison, Grierson, Bogan, Lacy, Porter, Schechter, and Zambonini are sometimes referred to herein as the "Individual Defendants."

21.     Defendant PTC and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Voluntary Disclosure Credit and Cooperation Credit

22.     Self-reporting a criminal violation to the U.S. Department of Justice ("DOJ") can result in leniency for a company when the DOJ is investigating a company or determining whether to bring charges, and what types, against a corporate defendant.

23.     The Federal Sentencing Guidelines for Organizations (the "Guidelines"), 2 U.S.S.G. § 8C2.5(g), specifies that a company that "fully cooperates in the investigation" and demonstrates "acceptance of responsibility for its criminal conduct" receives a two point reduction in the Guidelines range for cooperation credit. This cooperation credit may measurably reduce the company's punishment under the Guidelines, including applicable fines and forfeitures. Conversely, electing not to self-disclose discovered criminal violations may result in increased fines and may also lead to the inference that the violations were improperly covered up. This may also lead to unwanted adverse publicity that could adversely affect the company.

24.     Note 13 to the Federal Sentencing Guidelines for Organizations, 2 U.S.S.G. § 8C2.5, states in relevant part:

> *13.     To qualify for a reduction under subsection (g)(1) or (g)(2), cooperation must be both timely and thorough. To be timely, the cooperation must begin essentially at the same time as the organization is officially notified of a criminal investigation. To be thorough, the cooperation should include the disclosure of all pertinent information known by the organization. A prime test of whether the organization has disclosed all pertinent information is whether the information is sufficient for law enforcement personnel to identify the nature and extent of the offense and the individual(s) responsible for the criminal conduct. However, the cooperation to be measured is the cooperation of the organization itself, not the cooperation of individuals within the organization. If, because of the lack of cooperation of particular individual(s), neither the organization nor law enforcement personnel are able to identify the culpable individual(s) within the organization despite the organization's efforts to cooperate fully, the organization may still be given credit for full cooperation.*

25.     Under the Federal Principles of Prosecution of Business Organizations, DOJ prosecutors are required to consider ten factors in determining whether to bring charges, and what types, against a corporate defendant. These include, among other things, the nature and seriousness of the offense, the pervasiveness of wrongdoing within the corporation, the corporation's history of similar misconduct, the existence and effectiveness of the corporation's pre-existing compliance program, the collateral consequences of prosecuting the corporation, the

adequacy of non-criminal remedies, and the adequacy of the prosecution of individuals for the misconduct.

26.     The mitigation can come in many forms, including, but not limited to, a reduced financial penalty, a less severe form of resolution (such as a declination, non-prosecution agreement, or deferred prosecution agreement instead of a guilty plea), or a resolution with a subsidiary rather than the parent company.

### **Materially False and Misleading Statements Issued During the Period**

27.     On November 23, 2011, during aftermarket hours the Company filed a Form 10-K for the fiscal year ended September 30, 2011 (the "2011 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of September 30, 2011. The 2011 10-K was signed by Defendant Heppelmann. The 2011 10-K also contained signed SOX certifications required pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Heppelmann and Glidden accuracy of financial reporting, effectiveness of internal controls, and that all fraud was disclosed.

28.     The 2011 10-K stated in relevant part:

*We have been investigating certain matters in China, which matters and related remedial actions could have an adverse effect on our business.*

We have been investigating payments by certain business partners and expenses by certain employees in China that raise questions of compliance with laws, including the Foreign Corrupt Practices Act, and/or compliance with our business policies. In connection with this matter, we have terminated certain employees and business partners in China, which may have an adverse impact on our level of sales in China until such replacements for those employees and business partners are in place and productive. Revenue from China has historically represented 6% to 7% of our total revenue. We have voluntarily disclosed the results of our investigation and associated remedial actions to the United States Department of Justice and the Securities and Exchange Commission. We are unable to predict

the outcome of these voluntary disclosures, which could include fines or other sanctions.

29.     On November 16, 2012, during aftermarket hours the Company filed a Form 10-K for the fiscal year ended September 30, 2012 (the "2012 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of September 30, 2012. The 2012 10-K was signed by Defendant Heppelmann. The 2011 10-K also contained signed SOX certifications required pursuant to SOX by Defendants Heppelmann and Glidden accuracy of financial reporting, effectiveness of internal controls, and that all fraud was disclosed.

30.     The 2012 10-K stated in relevant part:

***We have been investigating certain matters in China, which matters and related remedial actions could have an adverse effect on our business and our results.***

We have been investigating payments and expenses by certain business partners and employees in China that raise questions of compliance with laws, including the Foreign Corrupt Practices Act, and/or compliance with our business policies. In connection with this matter, we have terminated certain employees and business partners in China, which may have an adverse impact on our level of sales in China until replacements for those employees and business partners are in place and productive. Revenue from China has historically represented 6% to 7% of our total revenue. We have voluntarily disclosed the results of our investigation and associated remedial actions to the United States Department of Justice and the Securities and Exchange Commission and are continuing to provide additional information as requested by those agencies with respect to this matter. Resolution of this matter could include fines or other sanctions but we are unable to estimate an amount, if any.

31.     On November 22, 2013, during aftermarket hours the Company filed a Form 10-K for the fiscal year ended September 30, 2013 (the "2013 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of September 30, 2013. The 2013 10-K was

signed by Defendant Heppelmann. The 2013 10-K also contained signed SOX certifications required pursuant SOX by Defendants Heppelmann and Glidden accuracy of financial reporting, effectiveness of internal controls, and that all fraud was disclosed.

32.    The 2013 10-K stated in relevant part:

***We have been investigating certain matters in China, which matters and related remedial actions could have an adverse effect on our business and our results.***

We have been cooperating to provide information to the U.S. Securities and Exchange Commission and the Department of Justice concerning payments and expenses by certain of our business partners in China and/or by employees of our Chinese subsidiary that raise questions concerning compliance with laws, including the U.S. Foreign Corrupt Practices Act.  Although we have begun discussions with the SEC and Department of Justice regarding possible resolution of this matter, we continue to respond to requests for additional information and cannot predict when or how this matter will be resolved. Resolution of this matter could include fines and penalties, which could significantly impact our cash balances. Any settlement or other resolution of this matter could have collateral effects on our business in China, the United States and elsewhere and could subject us to shareholder suits. Moreover, because we are unable to estimate an amount that could be associated with any resolution, we have not recorded a liability for this matter.  If we are required to record a liability for this matter, this could materially impact our results for the period in which the liability is recorded.

We terminated certain employees and business partners in China in connection with this matter, which may have an adverse impact on our level of sales in China until replacements for those employees and business partners are in place and productive. Revenue from China has historically represented 6% to 7% of our total revenue.

33.    On November 26, 2014, during aftermarket hours the Company filed a Form 10-K for the fiscal year ended September 30, 2014 (the "2014 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of September 30, 2014. The 2014 10-K was signed by Defendant Heppelmann. The 2014 10-K also contained signed SOX certifications

required pursuant SOX by Defendants Heppelmann and Glidden accuracy of financial reporting, effectiveness of internal controls, and that all fraud was disclosed.

34.     The 2014 10-K stated in relevant part:

***We have been investigating certain matters in China, which matters and related remedial actions could have an adverse effect on our business and our results.***

We have been cooperating to provide information to the U.S. Securities and Exchange Commission and the Department of Justice concerning payments and expenses by certain of our business partners in China and/or by employees of our Chinese subsidiary that raise questions concerning compliance with laws, including the U.S. Foreign Corrupt Practices Act. Our internal review is ongoing and we continue to respond to requests for information from these agencies, including a subpoena issued to the company by the SEC. We cannot predict when or how this matter may be resolved. Resolution of this matter could include fines and penalties; however we are unable to estimate an amount that could be associated with any resolution and, accordingly, we have not recorded a liability for this matter. If resolution of this matter includes substantial fines or penalties, this could materially impact our results for the period in which the associated liability is recorded or such amounts are paid. Further, any settlement or other resolution of this matter could have collateral effects on our business in China, the United States and elsewhere.

We terminated certain employees and business partners in China in connection with this matter, which may have an adverse impact on our level of sales in China. Revenue from China has historically represented 5% to 7% of our total revenue.

35.     On April 29, 2015, the Company issued a press release announcing its second quarter 2015 results, stating in part:

**Impact of an Investigation in China**

We have, **since making a voluntary disclosure to the U.S. Securities and Exchange Commission and the Department of Justice, been cooperating to provide information to those agencies concerning expenditures by certain of our business partners in China and by our China business**, including for travel and entertainment, that apparently benefitted employees of customers regarded as state owned enterprises in China. This matter involves issues regarding compliance with laws, including the U.S. Foreign Corrupt Practices Act. Negotiations with the SEC to reach a resolution of its investigation have begun but have not been concluded. We expect to begin negotiations with the Department of Justice to resolve its investigation in the near future. Resolution of this matter is likely to include fines and penalties. Given the uncertainty regarding

whether settlements can be reached and, if reached, on what terms, we are not able to estimate a range of reasonably possible loss with regard to any such settlements and have not recorded any liability in connection with this matter. If settlements are reached, we believe that the associated financial liability could be material to our results of operations for the fiscal period in which the liability is recorded. Further, any settlement or other resolution of this matter could have collateral effects on our business in China, the United States and elsewhere.

[Emphasis added].

36.     The statements referenced in ¶¶ 27 – 35 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) PTC did not disclose to the SEC and the DOJ the full results of its investigation into whether PTC China improperly provided recreational travel to Chinese government officials in violation of the FCPA; (2) PTC was not cooperating with the SEC and the DOJ in connection with their investigations into whether PTC China improperly provided recreational travel to Chinese government officials in violation of the FCPA; (3) PTC's books and records were inaccurate and PTC failed to maintain adequate internal accounting controls; and (4) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

37.     On July 9, 2015, during aftermarket hours the Company issued a press release announcing its preliminary third quarter 2015 results and announcing that it expects to record a minimum liability of approximately $13.6 million in connection with its previously disclosed China investigation, stating in relevant part:

**Other Important Information**

In connection with our ongoing negotiations to resolve previously disclosed investigations by the U.S. Securities & Exchange Commission and the Department of Justice with respect to our China business, we expect to record a liability of approximately $13.6 million in our third quarter financial statements. This is the minimum amount of liability we expect to incur if we are able to reach a settlement in this matter, and does not include any amounts associated with potential fines that might be imposed by either or both of the SEC and DOJ, which amounts would increase our liability and could be significant. Because our discussions with the SEC and DOJ are ongoing, the amount of this accrual could increase by the time we release our third quarter results on July 29, 2015. Further, there can be no assurance that we will reach a settlement with these agencies or that the cost of such settlements, if reached, would not materially exceed the existing accrual.

38.     On this news, shares of PTC fell $2.00 per share or approximately 5% from its previous closing price to close at $38.78 per share on July 10, 2015.

39.     On July 29, 2015, during aftermarket hours the Company issued a press release announcing its third quarter 2015 results and announcing that it recorded a minimum liability of $13.6 million in connection with its previously disclosed China investigation, stating in relevant part:

PTC provides non-GAAP supplemental information to its financial results. Non-GAAP revenue, non-GAAP operating expenses, non-GAAP operating margin, non-GAAP gross profit, non-GAAP gross margin, non-GAAP net income and non-GAAP EPS exclude the effect of purchase accounting on the fair value of acquired deferred revenue, stock-based compensation expense, amortization of acquired intangible assets, restructuring charges, acquisition-related expenses, costs associated with terminating a U.S. pension plan, a litigation accrual of $13.6 million associated with our previously disclosed China investigation, certain identified non-operating gains and losses, the related tax effects of the preceding items, and certain discrete tax items.

\*          \*          \*

Further, our results could be materially adversely affected by the resolution of our previously announced investigation in China. In the third quarter, we recorded a liability of $13.6 million associated with pending discussions with the Securities and Exchange Commission and the Department of Justice to resolve this matter.

This is the minimum amount of liability we expect to incur if we are able to reach a settlement in this matter, and does not include any amounts associated with potential fines that might be imposed by either or both of the SEC and DOJ, which amounts would increase our liability and could be significant. There can be no assurance that we will reach a settlement with these agencies or that the cost of such settlements, if reached, would not materially exceed the existing accrual.

40. On this news, shares of PTC fell $1.57 per share or approximately 4% from its previous closing price to close at $36.23 per share on July 30, 2015.

41. On February 16, 2016, the DOJ issued a press release announcing that it entered into a non-prosecution agreement ("NPA") with PTC China in which PTC China agreed to pay a $14.54 million penalty to resolve the government's investigation into whether PTC China improperly provided recreational travel to Chinese government officials in violation of the FCPA.

42. In the NPA, the DOJ stated that PTC China did not receive voluntary disclosure credit or full cooperation credit because:

The Office enters into this Non-Prosecution Agreement based on the individual facts and circumstances presented by this case and the Companies. Among the factors considered in deciding what credit the Companies should receive were the following: **(a) the Companies did not receive voluntary disclosure credit because, although the Companies, through their parent corporation PTC Inc., reported to the Office in 2011 certain misconduct identified through a then-ongoing internal investigation, they did not voluntarily disclose relevant facts known to PTC Inc. at the time of the initial disclosure until the Office uncovered salient facts regarding the Companies' responsibility for the improper travel and entertainment expenditures at issue independently and brought them to the Companies' attention, after which the Companies disclosed information that they had learned as part of an earlier internal investigation**; (b) the Companies received partial cooperation credit of 15% off the bottom of the Sentencing Guidelines fine range for their cooperation with the Office's investigation, including collecting, analyzing, and organizing voluminous evidence and information for the Office, **but did not receive full cooperation credit for the reasons described in (a) above;**

[Emphasis added].

43.     On February 16, 2016, the SEC issued a press release announcing that it reached a settlement with PTC (the "SEC Settlement") in which PTC agreed to pay $11,858,000 in disgorgement plus $1.764 million in prejudgment interest in connection with the SEC's investigation into whether PTC China improperly provided recreational travel to Chinese government officials in violation of the FCPA.

44.     The SEC settlement stated that PTC's books and records were inaccurate, and PTC failed to maintain adequate internal accounting controls:

> PTC-China's books and records were consolidated into PTC's books and records, thereby causing **PTC's books and records to be inaccurate**. **PTC failed to devise and maintain an adequate system of internal accounting controls** sufficient to prevent and detect these improper payments that occurred over several years.

*        *        *

> PTC voluntarily self-reported the results of its internal investigation to the Commission and responded to information requests from the Commission staff. **PTC did not, however, uncover or disclose the full scope and extent of PTC-China's FCPA issues until 2014.**

[Emphasis added].

45.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired PTC securities trade on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the

Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

47.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PTC securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PTC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

48.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of PTC;

- whether the Individual Defendants caused PTC to issue false and misleading public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;

- whether the prices of PTC securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

52.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- PTC securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold PTC securities between the time the Defendants failed to disclose or misrepresented material facts and the

time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

53.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

54.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against Defendants PTC, PricewaterhouseCoopers LLP, Heppelmann, Glidden, and Miller**

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

57.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and

other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of PTC securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire PTC securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

58.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for PTC securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about PTC's finances and business prospects.

59.     By virtue of their positions at PTC, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

60.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers

and/or directors of PTC, the Individual Defendants had knowledge of the details of PTC's internal affairs.

61.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of PTC. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to PTC's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for PTC's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning PTC's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired PTC securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged upon the revelation of the alleged corrective disclosures.

62.     During the Class Period, PTC's securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of PTC securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class,

the true value of PTC securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of PTC's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

63.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

65.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66.     During the Class Period, the Individual Defendants participated in the operation and management of PTC, and conducted and participated, directly and indirectly, in the conduct of PTC's business affairs. Because of their senior positions, they knew the adverse non-public information regarding PTC's business practices.

67.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to PTC's financial condition and results of operations, and to correct promptly any public statements issued by PTC which had become materially false or misleading.

68.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PTC disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause PTC to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of PTC within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PTC securities.

69.     Each of the Individual Defendants, therefore, acted as a controlling person of PTC. By reason of their senior management positions and/or being directors of PTC, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, PTC to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of PTC and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

70.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PTC.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 7, 2016

Respectfully submitted,

By: /s/ Jeffrey C. Block
**BLOCK & LEVITON LLP**
Jeffrey C. Block (600747)
Jason M. Leviton (678331)
Joel A. Fleming (685285)
155 Federal Street, Suite 400
Boston, MA 02110
(t) 617.398.5600
(f) 617.507.6020
jeff@blockesq.com
jason@blockesq.com
joel@blockesq.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
Phillip Kim, Esq.
275 Madison Avenue, 34th Floor
New York, NY  10016
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

Counsel for Plaintiff