## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MATTHEW CRANDALL, Individually and on Behalf of all Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>PTC INC., JAMES HEPPELMANN, JEFFREY GLIDDEN, ANDREW MILLER, ROBERT P. SCHECHTER, MICHAEL E. PORTER, PAUL A. LACY, THOMAS BOGAN, and DONALD K. GRIERSON,<br><br>    Defendants. | **Case No.: 16-cv-10471-MPK**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Matthew Crandall ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants PTC Inc. ("PTC"), James Heppelmann, Jeffrey Glidden, Andrew Miller, Robert P. Schechter, Michael E. Porter, Paul A. Lacy, Thomas Bogan, and Donald K. Grierson (the "Defendants"), alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) and certain others listed at ¶133 below who purchased or otherwise acquired PTC securities between November 24, 2011, and July 29, 2015, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b)

and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and directors.

2.      The Foreign Corrupt Practices Act (the "FCPA") prohibits U.S. companies like PTC from paying bribes to foreign officials with the intent of securing business.

3.      The FCPA contemplates that unlawful payments to foreign officials will often be made by local business employees without the knowledge of senior management or the board of directors. Accordingly, the U.S. Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC"), who enforce the FCPA, encourage companies to voluntarily disclose when they uncover credible evidence that they have violated the FCPA, and to cooperate with the resulting investigations. Such voluntary disclosure and cooperation results in much less serious punishment (e.g., for relatively minor offenses, declining to prosecute at all versus entering into a non-prosecution or deferred prosecution agreement), and much smaller fines or penalties if the DOJ and SEC do decide to prosecute or pursue civil remedies.

4.      The DOJ and SEC have both made clear that any voluntary disclosure and cooperation must be full and complete. That is, companies seeking such credit must disclose *all* material facts related to FCPA violations that they are aware of.

5.      In 2011, PTC announced that it had discovered that its Chinese operations may have paid bribes to Chinese officials of state-owned entities ("SOEs") to secure their business. As PTC described it, the incident was relatively minor, involving a single country. Further, PTC claimed that it had adequate internal controls, suggesting that the wrongdoers had used elaborate means to evade them, reducing PTC's culpability. Finally, PTC claimed that it voluntarily reported the misconduct to the DOJ and SEC, and that it had cooperated with the DOJ and SEC's

investigations, further reducing its culpability. PTC continued to make these announcements in every annual report throughout the Class Period.

6.      Not so. PTC did in fact investigate in 2011, and did self-report FCPA violations to the DOJ and SEC. But unbeknownst to investors – and, initially, to the SEC and DOJ – PTC had investigated the same FCPA violations in 2006, 2008, and 2010. PTC's earlier 2006, 2008 and 2010 investigations uncovered credible evidence that its employees were making improper payments to Chinese officials, and even uncovered the specific accounting code these employees had used to conceal the improper payments.  PTC neither disciplined the employees nor instituted adequate internal controls to prevent further violations.

7.      PTC did not report its FCPA violations to the SEC and DOJ following the 2006, 2008, and 2010 investigations, even though it was well aware of the violations. Nor, when it self-reported in 2011, did it disclose to the SEC and DOJ that it had conducted these earlier investigations – still less that they had uncovered credible evidence of FCPA violations.

8.      Following PTC's purported 2011 self-report, the SEC and DOJ correctly refused to take PTC at its word that it had voluntarily disclosed **all** the facts. In 2014, the DOJ uncovered additional facts, known to PTC in 2011, showing that the misconduct was more widespread than PTC had self-reported, and brought them to PTC's attention. At that point, PTC confessed that it had investigated corrupt payments in 2006, 2008, and 2010, and uncovered credible evidence of FCPA violations at those earlier dates.

9.      On July 9, 2015, PTC announced that it would record a $13.6 million liability related to the FCPA investigations. PTC also announced that this amount was the minimum it could pay, and stated that negotiations with the DOJ and SEC were continuing – suggesting that it would also have to pay additional fines and penalties. The markets were surprised that PTC's

heavy penalty would not be sufficient to resolve the purportedly voluntarily-reported FCPA violations. On this news, shares of PTC fell $2.00 per share or approximately 5% from their previous closing price to close at $38.78 per share on July 10, 2015.[1]

10.     Then, on July 29, 2015, PTC announced that it had recorded the $13.6 million liability, but that negotiations with DOJ and SEC over the FCPA violations were continuing – showing that resolving the investigations, even after the $13.6 million payment, was no simple matter, and would likely involve further material penalties.

11.     On this news, shares of PTC fell $1.57 per share or approximately 4% from its previous closing price to close at $36.23 per share on July 30, 2015.

12.     In the end, PTC paid over $14.5 million to resolve the DOJ's assertion of criminal liability against PTC.  Thus, in total, PTC paid more than $28 million to resolve the FCPA related charges with DOJ and SEC.

13.     Legal professionals commented that with PTC's wrongdoing, particularly the fact that PTC  paid relatively small bribes, and the misconduct only occurred in one country, the DOJ typically would have declined to prosecute, leaving the matter with the SEC, which would have collected a much smaller civil penalty – if any – and may not have required factual admissions of wrongdoing. But professionals explained the DOJ's involvement, and the resulting fine, by the fact that PTC's so-called voluntary disclosure had withheld material facts.

14.     PTC's cover-up has had dire consequences. Even just financially, PTC's cover-up has cost it up to an additional $14.5 million. PTC's 2011-2015 financial statements, because they did not recognize a contingent liability for its FCPA violations, overstated its net income.

---

[1] All stock prices are adjusted for dividends.

15.     Beyond the strict financial price, PTC's cover-up has also brought the DOJ's unwelcome (and continuing) attention to its operations. And PTC's admissions of wrongdoing in the DOJ and SEC settlements have also led to a Chinese government investigation of its misconduct, which may result in further penalties.

## II.    JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

18.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District, and PTC's principal place of business is located in this District.

19.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.   PARTIES

20.     Plaintiff Matthew Crendall, as set forth in his Certification previously filed on the Court's docket and incorporated herein by reference, purchased PTC securities at artificially inflated prices during the Class Period and was damaged upon the revelation through the alleged corrective disclosures.

21.     Defendant PTC designs, manufactures, sells, maintains, and provides training in, its proprietary software, and maintains operations in the Americas, Europe, and Asia Pacific, including China. The Company is incorporated in Massachusetts with principal executive offices located at 140 Kendrick Street, Needham, MA 02494. PTC's common stock trades on the NASDAQ under the ticker symbol "PTC".

22.     Defendant James Heppelmann joined PTC in 1998. He served as its Executive Vice President and Chief Product Officer from February 2003 to March 2009, its President and COO from March 2009 to September 2010, and has served as its President and CEO since October 2010.

23.     Defendant Jeffrey Glidden was PTC's Executive Vice President and CFO from September 2010 until February 5, 2015.

24.     Defendant Andrew Miller has been PTC's Executive Vice President and CFO since February 5, 2015.

25.     Defendant Robert P. Schechter has been a director of PTC's Board since September 2009, and has served as chair of its Audit Committee since at least January 2011.

26.     Defendant Paul A. Lacy has been a director of PTC since September 2009, and has served on its Audit Committee since at least January 2011.

27.     Defendant Thomas Bogan was a director of PTC's Board from August 2011 to June 2015, and served on its Audit Committee between at least October 2012 and June 2015.

28.     Defendant Donald K. Grierson has served as a director of PTC since 1987, served as its Lead Independent Director from 2010 to June 2012, and served on its audit committee from March 2009 until at least January 2013. Defendant Grierson also served as the Chair of PTC's Board between at least November 2012 and 2015.

29.    Defendants Heppelmann, Glidden, Miller, Grierson, Bogan, Lacy, and Schechter are sometimes referred to herein as the "Individual Defendants."

30.    Defendant PTC and the Individual Defendants are referred to herein, collectively, as the "Defendants."

### IV.    DEFENDANTS' MISCONDUCT

#### A. PTC's Chinese Business

31.    During 2005-2011, PTC's business was primarily to develop, market, and support product lifecycle management software and related services that help companies design products, manage product information, and improve product development. PTC had three main sources of revenues: (1) selling computer software and hardware, namely computer-aided design, manufacturing, and engineering, and project lifecycle management software, which is software designed to assist companies in organizing their projects, employee collaborations, and product development; (2) maintenance on existing software; and (3) selling services such as consulting and training. During 2005-2011, PTC derived about 12-13% of its revenues from the Pacific Rim region. The plurality of PTC's Pacific Rim revenues derived from China.

32.    During 2005-2011, PTC conducted its operations in China through two wholly-owned subsidiaries: Parametric Technology (Shanghai) Software Co. Ltd., and Parametric Technology (Hong Kong) Ltd. (collectively, "PTC China"), which conducted business as a single unit.

33.    PTC (U.S.) exercised substantial control over PTC China. PTC China's employees had global functional reporting lines to PTC (U.S.), rather than an independent management structure. The functional reporting lines provided PTC (U.S.) with control over PTC China's activities, including its sales process. PTC China's senior sales staff reported to a Division Vice

President of Sales, who was a PTC employee based in China. For most of 2005-2011, this Division Vice President reported to the PTC General Manager of the Asia Pacific Region, or directly to PTC's Executive Vice President of Sales, based in PTC's headquarters in Needham, Massachusetts. For other functions, including sales operations and global services, various PTC China employees reported up to PTC (U.S.) employees, both based in China and the United States. Consistent with the functional reporting structure, PTC often moved its key employees to various subsidiaries throughout the world.

34.     For the sales, sales operations, and global services functions, the review of proposed transactions followed a hierarchical approach through PTC China and, if needed, to employees at other PTC entities, including PTC (U.S.). PTC (U.S.) employees approved pricing discounts above certain thresholds for PTC China and reviewed certain PTC China contract documents.

35.     Many of PTC China's customers were SOEs that were controlled by the government of China and performed functions that the Chinese government treated as its own. PTC (U.S.), not PTC China, was the counter party on most of the contracts with PTC China's SOE clients.

36.     Further, PTC (U.S.) set the business and financing goals for its subsidiaries, including PTC China. Each PTC function (including sales, marketing, and finance) received a worldwide budget from PTC to allocate among its various subsidiaries. PTC also set regional sales targets and had regional managers who allocated the sales targets among the countries and subsidiaries.

**B.  PTC's violations of the FCPA**

*i.  PTC bribes Chinese government officials to obtain business from SOEs*

37.     PTC China routinely engaged the services of local "Business Partners," Chinese companies that helped PTC China find prospective contracts, assisted PTC China in the sales process with Chinese SOEs, and provided additional services to PTC China's customers that had been outsourced by PTC China, including information technology services. PTC China failed to conduct meaningful due diligence of its Chinese Business Partners, notably with respect to corruption risks or anti-corruption controls of these Chinese Business Partners.

38.     PTC China's senior sales staff had wide discretion in setting the fee arrangements with Chinese Business Partners. Often, the SOE employees and officers chose the Business Partner with whom they wished to collaborate.

39.      Generally, commissions to Business Partners were set as a percentage of the contract price if PTC China won the contract in question. These commissions were typically referred to as "influence fees" to help PTC China win contracts. PTC China and the Business Partner generally agreed to a price range for the Business Partners' commission of between 15% and 30% of the total deal price if the deal was successful. These extremely high success fees were a red flag that the Business Partners were engaging in improper conduct such as bribery.

40.     PTC China then negotiated the commissions with the Business Partner at or about the time a deal closed. PTC China's senior staff reported to a PTC employee who had authority over the commission approval process. If the Business Partner was to provide subcontracted services such as information technology services, those services might either be included in the total commission or itemized separately using a line item referred to as "COD," for "completely outsourced deals."

41.     PTC had a corporate theatre at its headquarters in Massachusetts that was designed for demonstrations of its products, and PTC headquarters was also equipped to provide customer

training on its products. According to PTC policy, PTC should not pay for customer travel to its

headquarters for such training. However, during contract negotiations, SOE customers frequently

requested that PTC China provide employees with travel to the United States, nominally for

training at PTC headquarters in Massachusetts, but primarily for recreational travel to other parts

of the United States. PTC China, its Business Partner, and the SOE would determine a travel

budget, which was then added into the contract price. In some cases, the overseas travel costs were

specifically itemized in the initial contract documents for approval by senior PTC China sales staff;

however, the overseas travel costs line item was removed from the final contract documents that

were signed by PTC and the SOEs. Instead, from 2005-2008, the money budgeted for overseas

travel was disguised using the COD line item to make it appear as though the travel expenses were

subcontracting payments to the Business Partner, while from late 2008/early 2009 to 2011, the

bribes were included in the Business Partner's expenses.

    42.    Generally, the trips included one or two days of business activities at PTC

headquarters in order to justify the trips, preceded or followed by several days of sightseeing that

lacked any business purpose and that was in fact the primary reason for the trip.

    43.    Examples of these overseas trips are:

• In April 2008, six officials of an SOE ("SOE Customer A") and a senior PTC China
  salesperson visited PTC's Massachusetts office for a one-day meeting. The PTC
  China salesperson further arranged for a Business Partner to pay $51,495 for
  sightseeing visits to New York, Boston, Los Angeles and Honolulu for the Chinese
  government officials (and himself). The ten day trip included lodging at five star
  hotels; tours of Rockefeller Center, the Statue of Liberty, the United Nations, and
  the Empire State Building, along with tickets to a professional basketball game
  while in New York; tours of MIT, Harvard, and Faneuil Hall while in Boston; a
  tour of the Grand Canyon while in Las Vegas; a city tour while in Los Angeles; and
  a city tour, a tour of Pearl Harbor, a visit to the Polynesian Cultural Center, golfing,
  and a sunset dinner cruise while in Honolulu. As a result, during 2008, PTC and
  PTC China received an improper benefit of at least three contracts, signed by PTC
  (U.S.), worth $1.2 million, from SOE Customer A.

• In December 2007, during contract negotiations with an SOE ("SOE Customer B"),

a PTC China employee agreed to provide its officials with over $84,000 for future overseas travel expenses. The PTC China employee emailed his supervisor at PTC China the terms of a deal with SOE Customer B that included $84,429 for the overseas travel, which he initially recorded as "overseas training." Later, the PTC China employee disguised "overseas training" as COD costs, stating: "I replace the 'oversea training' in the sheet to the 'COD1' [...] As you know, the customers just want sightseeing instead of oversea training." Subsequently, the PTC China employee disguised the overseas travel costs as COD expenses in three deals, signed by PTC (U.S.), worth nearly $1.7 million, with SOE Customer B.

• PTC China provided SOE Customer B with the agreed-upon overseas travel in 2010, when it arranged for nine of its officials to visit PTC's Massachusetts office for a one-day meeting. PTC China employees concurrently had a Business Partner provide these Chinese government officials with sightseeing visits to New York, Washington, D.C., Los Angeles, and Honolulu, including among the activities, tours of West Point Academy, Rockefeller Center, and the Statue of Liberty while in New York; Universal Studios while in Los Angeles; and Pearl Harbor while in Honolulu.

• In December 2007, while negotiating a $3.4 million deal with an SOE ("SOE Customer C"), a PTC China salesperson emailed his supervisors at PTC China contract documents that included overseas travel expenses of $173,400. In July 2008, while negotiating a $1.2 million deal with SOE Customer C, another PTC China salesperson emailed the same supervisors contract documents that included overseas travel expenses of $104,000. When completing both deals, PTC China employees excluded the overseas travel expenses from the final contract documents that were signed by PTC (U.S.) and SOE Customer C.

• PTC China provided SOE Customer C with the agreed-upon overseas travel in May 2010, when it arranged for five of its officials to visit PTC's Massachusetts office for a one-day meeting. PTC China employees concurrently had a Business Partner provide these Chinese government officials with a sightseeing visit to New York, Las Vegas, and Los Angeles, including among other activities, tours of the United Nations, the Statue of Liberty, and West Point while in New York; the Grand Canyon while in Las Vegas; and Universal Studios while in Los Angeles.

• In May 2010, a PTC China salesperson accompanied two officials of an SOE ("SOE Customer D") on a visit to PTC's Massachusetts office for a one-day meeting. PTC China sales staff concurrently had a PTC China Business Partner provide these Chinese government officials with sightseeing visits to New York, Boston, Atlanta, Las Vegas, and Los Angeles, including among other activities, tours of the Grand Canyon while in Las Vegas; Universal Studios while in Los Angeles; and shopping excursions. In July 2010, another PTC China salesperson accompanied seven officials of SOE Customer D on a second visit to PTC's U.S. offices. Once again, PTC China sales staff had one of its Business Partners provide these Chinese government officials with sightseeing visits to New York, Boston, New London, Connecticut, Washington, D.C., Las Vegas, San Diego and Los Angeles, including among other activities, tours of Niagara Falls, the Statue of

Liberty, the Empire State Building, and the Intrepid Sea, Air & Space Museum Complex while in New York; the Submarine Force Library & Museum while in New London; the Grand Canyon while in Las Vegas; Universal Studios while in Los Angeles; and shopping excursions. These trips influenced SOE Customer D to purchase over $9 million of products from PTC (U.S.) and PTC China.

44.     Overall, from 2006 into 2011, PTC China, through its Business Partners, paid at least $1.17 million to fund at least 10 trips for Chinese government officials that included significant non-business travel. The costs of these trips were improperly recorded in PTC's books and records as COD or Business Partner related commissions or subcontracting payments, without any indication that they were primarily for sightseeing and other non-business related activities. PTC improperly profited by at least $11.85 million from contracts obtained from the SOEs whose government officials participated on these trips.

45.     From 2009 through 2011, PTC China sales staff provided at least $274,313 in improper gifts and entertainment directly to Chinese government officials. The value of the gifts and entertainment generally ranged from $50 to $600, and often included small electronics (e.g., cell phones, iPods, and GPS systems), gift cards, wine, and clothing. PTC China sales staff's long standing practice of providing the gifts to Chinese government officials was done at least in part to obtain or retain SOE business.

*ii.  PTC conducts internal investigations and discovers evidence of bribery.*

46.     PTC conducted internal investigations into potential bribery by PTC China in 2006, 2008, and 2010, including investigations into possible corruption involving PTC China's Business Partners (the "Earlier Investigations").

47.     Through the investigation conducted in 2008 (the "2008 Investigation"), PTC discovered that the COD line item was being used to account for improper payments. As a result of PTC's discovery, PTC China employees stopped using COD line items to account for bribes. Instead, after PTC's discovery, illegal travel expenses were included in the Business Partner

commissions by PTC China. The Business Partners paid for the overseas trips using the funds received from PTC China. The Business Partners provided PTC China with false documents indicating that they had performed subcontracted services even though there were no such services contemplated or performed and even though the funds were in fact used for, in part, improper recreational travel for Chinese SOE employees. For some of the more expensive trips for important Chinese SOE customers, the payments to the Business Partners were spread among and hidden within several contracts. PTC China used the false documents to justify payments to the Business Partner.

48.     PTC did not report any of the Earlier Investigations, or their conclusions, to SEC or DOJ.

49.     Nor did PTC do any of the following:

- Stop doing business with or investigate its Chinese Business Partners;

- Hire dedicated compliance staff;

- Test internal accounting controls;

- Monitor and supervise PTC China's senior sales staff to ensure that they enforced and followed anti-corruption policies;

- Investigate whether PTC China employees were violating PTC policies on improper gifts and entertainment; or

- Institute an appropriate FCPA compliance and training program at PTC China.

50.     Some PTC employees in the United States generally understood that SOE officials were spending additional days in the country, including for tourist activities. And certain PTC employees based in China were aware that PTC China employees were accompanying SOE employees and officers to tourist destinations.

### iii. PTC violates internal control requirements

51.    Section 13(b)(2)(A) of the Exchange Act requires reporting companies like PTC to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the reporting company's assets. 15 U.S.C. § 78m(b)(2)(A).

52.    Section 13(b)(2)(B) of the Exchange Act requires reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that the transactions: (i) are executed in accordance with management's general or specific authorization; and (ii) are recorded as necessary to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements, and to maintain accountability for assets. 15 U.S.C. § 78m(b)(2)(B).

53.    From at least 2006 through 2011, PTC failed to devise and maintain an adequate internal accounting controls system to address the potential FCPA problems posed by its ownership of, and control over, PTC China.

54.    Notably, PTC failed to: properly vet PTC China's Business Partners; police for corrupt payments by the Business Partners; monitor and supervise PTC China's senior sales staff to ensure that they enforced anti-corruption policies and kept accurate records concerning gifts to Chinese government officials; properly scrutinize travel related expenses to prevent reimbursement for employees' airfare, lodging, and other expenses that were either personal in nature or gifts for customers; limit the number or total value of gifts PTC China's sales staff could provide to any single individual or entity; and provide sufficient FCPA training for its employees.

55.    Moreover, despite the compliance issues unearthed by, and leading PTC to undertake, the Earlier Investigations, PTC failed to undertake periodic comprehensive risk

assessments for PTC China and to ensure that its internal accounting controls procedures were suited to PTC China's particular circumstances (in particular, its ongoing dealings with Chinese government officials). PTC's Code of Ethics and Anti-Bribery policies for the provision of business entertainment were vague (i.e., stating that employees should use "good taste" and consider the "customary business standards in the community" when providing business entertainment) and not risk-based to China. And PTC did not have independent compliance staff or an internal audit function that had authority to review and test its internal accounting controls processes or intervene into management decisions and, if appropriate, take remedial actions.

56.     Accordingly, in violation of Section 13(b)(2)(B) of the Exchange Act, PTC failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that it maintained accountability for its assets, and that its transactions were executed in accordance with management's authorization.

> *iv.  PTC investigates corruption but decides not to make a full disclosure to or fully cooperate with the SEC and DOJ*

57.     In 2011, PTC investigated complaints against a senior PTC China sales executive, Yu Kai Yuan. In the course of investigating the complaints, PTC discovered that Yu Kai Yuan and other PTC China employees had been making improper payments to SOE employees and officers.

58.     In 2011, PTC's senior management, under the oversight of its Audit Committee, engaged independent counsel, Wilmer Cutler Pickering Hale and Dorr LLP, and an independent forensic consulting firm, to undertake another internal investigation (the "2011 Investigation"). The 2011 Investigation came to a conclusion and reported its results to PTC senior officers, including the Individual Defendants, and PTC's audit committee. The 2011 Investigation's report and conclusions were completed by November 2011, at the latest.

59.     In the course of conducting the 2011 Investigation, PTC became aware of the Earlier Investigations and their results, including that PTC China had been using the COD accounting code to account for improper payments to Chinese officials. The Earlier Investigations and their results were reported to PTC's Audit Committee.

60.     Before November 2011, PTC reported to the SEC and DOJ that it had received evidence that certain PTC China employees may have offered improper payments to Chinese officials. PTC also reported the fact and results of the 2011 Investigation. But PTC reported neither the Earlier Investigations nor the Earlier Investigations' discoveries, and specifically did not report that PTC China had used the COD accounting code to account for improper payments to Chinese officials.

61.     In or around 2014, DOJ independently discovered certain of the facts unearthed in the Earlier Investigations, and brought them to PTC's attention. At that point, PTC voluntarily disclosed the Earlier Investigations and their results, including that PTC China had used the COD accounting code to account for improper payments to Chinese officials.

## C. DOJ and SEC made available many resources setting out the basis for their charging decisions on the FCPA

62.     The Department of Justice has issued numerous public memoranda issuing charging instructions to U.S. Attorneys that provide insight to companies facing FCPA investigations. These include the June 6, 1999 memorandum from Deputy Attorney General Eric Holder titled *Bringing Criminal Charges Against Corporation* (the "Holder Memorandum"), the January 20, 2003 memorandum from Deputy Attorney General Larry D. Thompson titled *Principles of Federal Prosecution of Business Organizations* (the "Thompson Memorandum"), and the August 28, 2008 memorandum from Deputy Attorney General Mark Filip titled *Principles of Federal Prosecution of Business Organizations* (the "Filip Memorandum").

63.     In amending the FCPA in 1988, Congress encouraged the Attorney General to publish guidelines setting out their view of FCPA enforcement. 15 U.S.C. § 78dd-1(d). On November 14, 2012, the SEC and DOJ jointly published *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, Criminal Division of the U.S. Department of Justice, and Enforcement Division of the U.S. Securities and Exchange Commission (the "Resource Guide").[2] The 120-page Resource Guide gave companies extensive insight into the SEC and DOJ views of the FCPA and charging practices.

64.     Officials within the SEC and DOJ also regularly give public speeches setting out their respective organizations' views of prosecutions under the FCPA.

### D.   Self-reporting and cooperation have a significant impact on fines and charging decisions

65.     DOJ and SEC's charging decisions are, in increasing order of severity, to decline to prosecute (called a "declination"), to enter into a Non-Prosecution Agreement ("NPA"), to enter into a Deferred Prosecution Agreement ("DPA"), or, in the case of the DOJ, to seek a guilty plea.

66.     If the DOJ does not decline to prosecute, resolution of an action may involve additional costly efforts, such as additional reporting obligations to DOJ or installation of a monitor, or collateral consequences, such as debarment (becoming ineligible to receive U.S. government contracts).

67.     Because of the complexity and obscurity of corporate investigations, the government's ability to investigate and prosecute FCPA violations depends critically on the corporation's voluntary disclosure and cooperation. See Holder Memorandum, at VI. B. (repeated

---

[2] Available at < https://www.justice.gov/sites/default/files/criminal-fraud/legacy/2015/01/16/guide.pdf>.

verbatim in the Thompson Memorandum and with changes not relevant here in the Filip Memorandum).

68.     Self-reporting a criminal violation to the DOJ can result in leniency for a company when the DOJ is investigating a company or determining whether to bring charges, and what types, against a corporate defendant.

69.     From as far back as 1999, DOJ and SEC enforcement memoranda have stressed the importance of voluntary cooperation:

> In determining whether to charge a corporation, that corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate with the government's investigation may be relevant factors. In gauging the extent of the corporation's cooperation, the prosecutor may consider the corporation's willingness to identify the culprits within the corporation, including senior executives, to make witnesses available, *[and] to disclose the complete results of its internal investigation []*[3]

Holder Memorandum, at VI. A. (repeated verbatim in the Thompson Memorandum and with changes not relevant here in the Filip Memorandum)

70.     Indeed, the Resource Manual provides that "both DOJ and SEC place a high premium on self-reporting, along with cooperation and remedial efforts, in determining the appropriate resolution of FCPA matters."

71.     SEC and DOJ have also stressed the importance of cooperation in speeches to guide industry:

> As many of you know, the Commission in the 2001 *Seaboard* statement on cooperation, explained how self-reporting, cooperation, self-policing, and remediation factor into our decisions when considering enforcement actions. [Footnote omitted]. And, I can tell you from experience that of those four factors, self-reporting is especially important to both the SEC and the Department of Justice.
>
> What are the benefits to your company of self-reporting? You can read about that in the SEC's press releases on enforcement actions, which routinely highlight how

---

[3] All bold and italicized emphases are added.

the quality of a company's cooperation has affected any resulting enforcement action. Typically, a company realizes the benefits of cooperation through a reduced penalty, or, at times, no penalty or even not proceeding in an exceptional case.

SEC Chair Mary Jo White, June 23, 2014 speech to the Twentieth Annual Stanford Directors' College ("Chair White June 2014 Speech")

72.     Yet cooperation and voluntary disclosure must be full and complete.

73.     The SEC examines "four broad measures of a company's cooperation", including:

• self-reporting of misconduct when it is discovered, including conducting a thorough review of the nature, extent, origins, and consequences of the misconduct, and promptly, *completely*, and effectively disclosing the misconduct to the public, to regulatory agencies, and to self-regulatory organizations;
[…]
• cooperation with law enforcement authorities, including providing SEC staff with *all* information relevant to the underlying violations and the company's remedial efforts.

Resource Manual at 55.

74.     The U.S. Attorneys' Manual ("USAM"), Title 9-28, *Principles of Federal Prosecution of Business Organizations*, which guides prosecutorial decisions, provides that:

In order for a company to receive any consideration for cooperation under this section, the company must identify all individuals involved in or responsible for the misconduct at issue, regardless of their position, status or seniority, and provide to the Department *all* facts relating to that misconduct.  If a company seeking cooperation credit declines to learn of such facts or to provide the Department with *complete* factual information about the individuals involved, its cooperation will not be considered a mitigating factor under this section.
USAM 9-28.700.

75.     Indeed, SEC Chair White and SEC Co-Director of the Division of Enforcement Andrew Ceresney have specifically highlighted that less-than-full cooperation is not cooperation:

Since launching our Cooperation Program in 2010, the Commission has made it clear that it will reward companies or individuals who cooperate, despite the fact that a violation has occurred. ***But receiving credit requires timely self-reporting, candor, thoroughly, prompt remediation and a serious commitment to act lawfully in the future.***

SEC Co-Director of the Division of Enforcement Andrew Ceresney, November 19, 2013, Keynote Address at the International Conference on The Foreign Corrupt Practices Act

Let me just say a few words about how to cooperate with SEC investigations.

As an initial matter, the decision to cooperate should be made early in the investigation. The tone and substance of the early communications we have with a company are critical in establishing the tenor of our investigations and how the staff and the Commission will view your cooperation in the final stages of an investigation. Holding back information, perhaps out of a desire to keep options open as the investigation develops, can, in fact, foreclose the opportunity for cooperation credit.

We are looking for companies to be forthcoming and candid partners with the SEC investigative team – and the board has a responsibility to ensure that management and the legal team are providing this kind of cooperation.

When choosing the path of self-reporting and cooperation, do so decisively. Make it clear from the outset that the board's expectation is that any internal investigation will search for misconduct wherever and however high up it occurred; that the company will act promptly and report real-time to the Enforcement staff on any misconduct uncovered; and that the company will hold its responsible employees to account.

There is, of course, cooperation and then there is cooperation, just as there are compliance programs that look great on paper but are not strongly enforced. We know the difference.

Cooperation means more than complying with our subpoenas for documents and testimony – the law requires you to do that. If you want your company to get credit for cooperation – and you should – then sincere and thorough partnering with the Division of Enforcement to uncover all the facts is required.

Chair White June 2014 Speech

76.     DOJ has also made clear that it will not give significant credit for partial

cooperation:

Understand, too, that we will use our own parallel investigation to pressure test a company's internal investigation: to determine whether the company actually sought to root out the wrongdoing and identify those responsible, as far up the corporate ladder as the misconduct goes, or instead merely checked a box on a cooperation punch list.

Companies that have not conducted comprehensive investigations will not secure significant cooperation benefits. Worse, companies that hamper the government's investigation while conducting an internal investigation – for example, by conducting interviews that serve to spread corporate talking points rather than

secure facts relating to individual culpability – will pay a price when they ask for cooperation credit.

Miller September 2014 Remarks

> For a company to receive full cooperation credit following a self-report, it must root out the misconduct and identify the individuals responsible, even if they are senior executives. We are not asking that you become surrogate FBI agents or prosecutors, or that you use law enforcement tactics like body wires. And we do not need to hear you say that executive A violated a particular criminal law. ***All we are saying is that we expect you to provide us with facts.*** We will take it from there.
> […]
>
> ***Additionally, for a company to receive full cooperation credit, the company must provide relevant documents and evidence, and should do so in a timely fashion.***
> […]
>
> ***Companies claiming to cooperate while conducting lackluster investigations with little results should not be surprised when they do not get credit for their supposed efforts. And they should not be surprised when they face the consequences of our own investigations.***

Assistant Attorney General Leslie R. Caldwell, Remarks at the 22nd Annual Ethics and Compliance Conference, October 1, 2014

> During my first year in leading the Criminal Division, we have tried to make as clear as possible what we expect from those companies that choose to cooperate. Put simply, if a company wants cooperation credit, we expect that company to conduct a thorough internal investigation and to turn over evidence of wrongdoing to our prosecutors in a timely and complete way. Perhaps most critically, we expect cooperating companies to identify culpable individuals—including senior executives if they were involved—and provide the facts about their wrongdoing.
> […]
>
> The mere voluntary disclosure of corporate misconduct—by itself—is not enough. All too often, corporations expect cooperation credit for voluntarily disclosing and describing the corporate entities' misconduct, and issuing a corporate mea culpa. True cooperation, however, requires identifying the individuals actually responsible for the misconduct—be they executives or others—and the provision of all available facts relating to that misconduct.
>
> Investigations must also be independent and designed to uncover the facts, not to spread company talking points or whitewash the truth. We expect that the complete facts about the wrongdoing will be provided, and in a timely way. As we work to be transparent, we expect transparency in return. Transparency is a two-way street, and we expect companies that are claiming to cooperate to walk the walk.

Assistant Attorney General Leslie R. Caldwell, April 17, 2015, Remarks to New York
University School of Law's Program on Corporate Compliance and Enforcement
("Caldwell April 2015 Remarks")

77.     Thus, voluntary disclosure and cooperation have a significant impact in DOJ and
the SEC's decisions of whether to decline to prosecute FCPA violations, to seek an NPA, a DPA,
or a guilty plea (or consent decree). Indeed, voluntary disclosure and full cooperation are essential
to obtaining declinations. The Resource Manual lists six representative samples of anonymized
cases where DOJ and SEC declined to prosecute – all six of them involved full self-reporting and
cooperation. Resource Manual, at 77-79; Laura Fraedrich and Jamie A. Schafer, *What Is In It For
Me: How Recent Developments in FCPA Enforcement Affect the Voluntary Disclosure Calculus*,
8 Global Trade and Customs Journal 257, 259 (2013) (noting that all the Resource Guide's
examples of declinations included voluntary disclosure). Nor is declination an impossible goal.
While declinations are typically non-public, the Resource Guide notes that "in the past two years
alone, DOJ has declined several dozen cases against companies where potential FCPA violations
were alleged." Resource Guide, at 79.

78.     Even if the SEC and DOJ do not decline to prosecute, self-reporting and
cooperation will have an impact on the size of the penalty the company will pay.

79.     The Federal Sentencing Guidelines for Organizations (the "Guidelines")[4] range is
the product of two numbers: the base fine and a multiplier based on the defendant's culpability
score.

80.     The base fine is calculated as the ***greatest*** of:

(1) the amount from the table in subsection (d) below corresponding to the offense
level determined under §8C2.3 (Offense Level); or

---

[4] The provisions of the U.S. Sentencing Guidelines applicable to PTC's bribery did not change
from the beginning of the Class Period to the Present.

***(2) the pecuniary gain to the organization from the offense***; or
(3) the pecuniary loss from the offense caused by the organization, to the extent the
loss was caused intentionally, knowingly, or recklessly.
2 U.S.S.G. § 8C2.4.[5]

81.     In this case, PTC's pecuniary gain was at least $11.85 million. See ¶44, above.

Thus, the minimum base fine is $11.85 million.

82.     The culpability score generates a minimum and maximum multiplier according to

the following chart:

| Culpability score | Minimum multiplier | Maximum multiplier |
| --- | --- | --- |
| 10 or more | 2.00 | 4.00 |
| 9 | 1.80 | 3.60 |
| 8 | 1.60 | 3.20 |
| 7 | 1.40 | 2.80 |
| 6 | 1.20 | 2.40 |
| 5 | 1.00 | 2.00 |
| 4 | 0.80 | 1.60 |
| 3 | 0.60 | 1.20 |
| 2 | 0.40 | 0.80 |
| 1 | 0.20 | 0.40 |
| 0 or less | 0.05 | 0.20 |

83.     Thus, at an absolute minimum, each one point increase in PTC's culpability score

increases minimum guidelines range by at least $2.37 million (0.2*$11.85 million) and maximum

guidelines range by at least $4.74 million (0.4*$11.85 million).

84.     The Guidelines, at 2 U.S.S.G. § 8C2.5(g), provide for reductions in culpability

scores for organizations that voluntarily disclose their misconduct and cooperate:

(g) Self-Reporting, Cooperation, and Acceptance of Responsibility
 (1) If the organization (A) prior to an imminent threat of disclosure or government
investigation; and (B) within a reasonably prompt time after becoming aware of the
offense, reported the offense to appropriate governmental authorities, fully
cooperated in the investigation, and clearly demonstrated recognition and
affirmative acceptance of responsibility for its criminal conduct, subtract 5 points;
or

---

[5] Plaintiffs believe that PTC's offense level was 28, resulting in a base fine of $6.30 million, less
than PTC's pecuniary gain.

(2) If the organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct, subtract 2 points;
(3) If the organization clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct, subtract 1 point.

85.     Thus, an organization that voluntarily discloses misconduct and fully cooperates in the investigation will receive a culpability score 4 points lower than an organization company that merely recognizes and accepts responsibility for its criminal conduct. These two provisions are referred to, respectively, as voluntary disclosure credit and cooperation credit. The voluntary disclosure and cooperation credit measurably reduce the company's punishment under the Guidelines, including applicable fines and forfeitures. The four point culpability score decrease amounts to a decrease in the minimum guideline range of $9.52 million and a decrease in the maximum guideline range of $19.04 million.

86.     Note 13 to the Federal Sentencing Guidelines for Organizations, 2 U.S.S.G. § 8C2.5, states in relevant part:

13.     To qualify for a reduction under subsection (g)(1) or (g)(2), cooperation must be both timely and thorough.  To be timely, the cooperation must begin essentially at the same time as the organization is officially notified of a criminal investigation.  To be thorough, the cooperation should include the disclosure of all pertinent information known by the organization.  A prime test of whether the organization has disclosed all pertinent information is whether the information is sufficient for law enforcement personnel to identify the nature and extent of the offense and the individual(s) responsible for the criminal conduct.  However, the cooperation to be measured is the cooperation of the organization itself, not the cooperation of individuals within the organization.  If, because of the lack of cooperation of particular individual(s), neither the organization nor law enforcement personnel are able to identify the culpable individual(s) within the organization despite the organization's efforts to cooperate fully, the organization may still be given credit for full cooperation.

87.     Further, an organization which affirmatively obstructs the SEC or DOJ's investigation can suffer even greater consequences, as the U.S. Sentencing Guidelines provide for a 3 culpability score increase if the organization obstructs justice. U.S.S.G. § 8C2.5(e). According

to the Principles of Federal Prosecution of Business Organizations, such obstructions can include "making representations or submissions that contain misleading assertions or material omissions; and incomplete or delayed production of records." USAM 9-28.730. Accordingly, PTC's claim to the DOJ and SEC that it had self-reported, coupled with its incomplete report, could justly have been considered obstruction of the investigation. The 3 point culpability score increase corresponds to an increase in the minimum guidelines range of $7.14 million and an increase in the maximum guidelines range of $14.28 million.

88.    Based on the fine assessed to PTC, PTC's culpability score appears to have been 7. See ¶94, below. Had PTC self-reported to the SEC and DOJ and cooperated with their investigations, it would have received a culpability score of 3. Further, by concealing information from the SEC and DOJ, PTC potentially risked an enhancement to its culpability score for obstruction of justice, which would have raised its culpability score to 10. Accordingly, the additional penalty PTC risked because – contrary to its public statements – it did not self-report and did not cooperate with the SEC and DOJ investigations is as follows:

| Scenario | Culpability score | Minimum guidelines range | Maximum guidelines range |
|---|---|---|---|
| Full self-report and cooperation | 3 | $7.14 million | $14.28 million |
| Withheld information but no obstruction of justice penalty assessed | 7 | $16.66 million | $33.32 million |
| Withheld information and obstruction of justice penalty assessed | 10 | $23.8 million | $47.6 million |
| *Additional penalty from failure to self-report* | | *$9.52-16.66 million* | *$19.04-33.02 million* |

89.     Moreover, electing not to self-disclose discovered criminal violations may also lead to the inference that the violations were improperly covered up. This may also lead to unwanted adverse publicity that could adversely affect the company.

90.     Practical examples abound. French firm Alstom S.A. initially declined to cooperate with an SEC and DOJ FCPA probe, though it later assisted the probe. Based on an analysis of the sentencing guidelines, the law firm Covington & Burling LLP estimated that had it fully cooperated and self-reported, it would have paid approximately 69% less.[6] And in PetroTiger Ltd., an egregious case where both of a company's co-CEOs, as well as its general counsel, were criminally charged for FCPA violations, the company's cooperation caused the DOJ to decline to prosecute the company at all; the company paid no penalty.

91.     Similarly, insufficient cooperation has factored into fines, penalties, and other sanctions assessed by the DOJ and SEC. For example, Weatherford International paid a combined $152.6 million sanction for FCPA violations to SEC and DOJ. The SEC cited Weatherford's poor cooperation, and Weatherford did not get a discount from the Sentencing Guidelines range. A memorandum from the law firm Steptoe & Johnson LLP largely attributed Weatherford's high fine to its failure to voluntarily disclose the matter and less-than-full cooperation with DOJ and SEC. Lucinda A. Low et al, 2013 FCPA Year in Review, Steptoe & Johnson LLP, at 5.[7]  BNP Paribas S.A. paid approximately $8.9 billion and was required to plead guilty for evading sanctions prohibiting transfers to certain countries. The Head of DOJ's Criminal Division Caldwell attributed the record penalty in part to BNP Paribas's limited cooperation in DOJ's investigation. Caldwell October 2014 Remarks. Notably, like PTC, BNP did offer some cooperation. *U.S. v. BNP*

---

[6] Covington & Burling LLP, Trends and Developments in Anti-Corruption Enforcement, Winter 2015, available at https://goo.gl/zvO3t7.
[7] Available at http://goo.gl/WhIIbM.

*Paribas S.A.*, 14-CR-460, dkt. # 13-2, at ¶¶73-74 (S.D.N.Y.) (acknowledging partial cooperation

from BNP).

## E.  PTC pays a significant penalty because it did not voluntarily cooperate with the SEC and DOJ.

92.    DOJ and SEC ultimately settled the criminal and civil claims against PTC (the

"DOJ Settlement", and the "SEC Settlement"). The DOJ and SEC Settlements were announced on

February 16, 2016. Both the DOJ and SEC Settlements took the form of NPAs, which are attached

as Exhibits 1 and 2, respectively, and incorporated by reference herein. The DOJ settlement called

for PTC to pay a penalty of $14.54 million. DOJ Release at 4. The DOJ settlement acknowledges

that the penalty was in addition to the disgorgement paid to the SEC. The SEC Settlement called

for PTC to pay $13.62 million in the form of disgorgement and prejudgment interest. SEC

Settlement, at 11. The total settlement amount was $28.16 million. In addition, PTC China

undertook to continue to "cooperate with [DOJ] in any ongoing investigation of the conduct of

[PTC China] and their officers, directors, employees, agents, Business Partners, and consultants

relating to violations of the [FCPA]." And PTC was required to make detailed factual admissions.

These detailed factual admissions will make it more difficult to defend itself in further government

investigations – including an investigation initiated by the Chinese government soon after the DOJ

and SEC Settlements were announced.[8]

93.    In explaining its decision to impose a stiff fine, DOJ explained in the NPA that PTC

did not receive voluntary disclosure or cooperation credit:

> Among the factors considered in deciding what credit [PTC China] should receive
> were the following: (a) [PTC China] did not receive voluntary disclosure credit
> because, although [PTC China], through their parent corporation PTC Inc., reported
> to [DOJ] in 2011 certain misconduct identified through a then-ongoing internal
> investigation, they did not voluntarily disclose relevant facts known to PTC Inc. at

---

[8] See PTC Inc., Prospectus Supplement, filed May 2, 2016, at ii.

the time of the initial disclosure until the Office uncovered salient facts regarding [PTC China's] responsibility for the improper travel and entertainment expenditures at issue independently and brought them to [PTC China's] attention, after which [PTC China] disclosed information that they had learned as part of an earlier investigation; (b) [PTC China] received partial cooperation credit of 15% off the bottom of the Sentencing Guidelines fine range for [DOJ's] investigation, including collecting, analyzing, and organizing voluminous evidence and information for [DOJ], but did not receive full cooperation credit for the reasons described in (a) above.

94.     Based on DOJ's claim that PTC received a penalty 15% below the guidelines range, the minimum guideline penalty for PTC's offense was about $17.11 million, or about 1.44*11.85 million, PTC's pecuniary gain. A 1.40 multiplier for the minimum guidelines range corresponds to a culpability score of 7.

95.     Commentators attributed DOJ's involvement in this relatively small bribery case to the fact that PTC's claim to have self-reported were false. For example, in an article titled PTC Case Offers Lessons on FCPA Self-Disclosure appearing February 23, 2016, James M. Koukios and Lauren A. Navarro of Morrison & Foerster LLP wrote:

> When asked in late 2015 whether there had been a "slowdown" in DOJ FCPA enforcement, Assistant Attorney General Leslie Caldwell stated that the Criminal Division was focusing on "bigger, higher impact" FCPA cases that involve ***bribery in multiple countries or wrongdoing by senior executives***. [Footnote omitted]. And indeed, the SEC resolution papers indicated that many of the nine [2015] SEC-only enforcement actions involved relatively small penalties and bribery that was generally contained to one foreign country. Many of those actions also included a self-disclosure, cooperation, or both.

> In light of this, and because of the availability of a noncriminal remedy in the form of the SEC resolution itself, one could infer that in several of these SEC-only cases from 2015, the DOJ exercised its discretion under the Federal Principles of Prosecution of Business Organizations and declined to pursue a criminal resolution. Prior to Feb. 16, 2016, it appeared that DOJ might be following a similar course this year, as it declined to join the two SEC corporate FCPA resolutions brought up to that point.

> But on Feb. 16, the DOJ and SEC brought parallel FCPA corporate resolutions involving Massachusetts-based issuer PTC Inc. and two of its wholly owned Chinese subsidiaries under circumstances that, at least at first glance, ***seemed***

*similar to the cases that DOJ declined to join in 2015 and earlier in 2016: a relatively small penalty and bribery contained to one foreign country, plus self-disclosure and cooperation.*

So what was different about the PTC case that made DOJ pursue its own resolution? The answer appears to be the manner in which PTC self-disclosed the misconduct. According to the DOJ resolution papers, PTC and its subsidiaries did not disclose all relevant facts known to the companies at the time of the initial disclosure. In fact, they did not disclose these facts until the department independently uncovered them and brought them to PTC's attention. Thus, the PTC resolution sends a strong message that *incomplete or piecemeal self-disclosures are insufficient to obtain a declination*. In other words, DOJ is saying that if you are coming in, you must be all-in.[9]

96.     Thomas R. Fox, an attorney, compliance ambassador for compliance firm The Red Flag Group, and contributing editor to the well-known and widely-read FCPA Blog, commented on February 19, 2016:

> It cannot be determined from the resolution documents whether PTC got some incredibly bad legal advice or made a costly decision. However, for any [Chief Compliance Officer] the clear message is that if you do self-disclose, you must not hide back any facts. This does not mean you have to waive privilege and turn over your entire investigation file, including opinions from your outside counsel. But you do have to turn over facts you uncover. For this lack of forthrightness, it cost the company in the range of seven figures in its settlement with the DOJ.

97.     In a February 29, 2016 client memo titled *DOJ and SEC Pressure Test Accuracy of Self-Reporting and Cooperation in PTC FCPA Settlement*, the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP observed that the PTC FCPA Settlement "illustrates that the DOJ and SEC are making good on recent promises to 'pressure test a company's internal investigation with the facts [those agencies] gather on [their] own'" (citing the Caldwell April 2015 Remarks). And a February 21, 2016 client alert by the law firm Covington & Burling LLP observed that "[i]f PTC

---

[9] Doug Cornelius, an attorney and Chief Compliance Officer remarked that PTC's primary misconduct "does not sound so bad. Not great. But not a $28 million fine bad." Excessive Travel as a Bribe Under the FCPA, available at http://www.compliancebuilding.com/2016/02/24/excessive-travel-as-a-bribe-under-the-fcpa/.

had received credit for self-reporting, it likely would have earned a lower culpability score and a larger cooperation credit discount." A February 17, 2016 client alert by the law firm Sullivan & Cromwell LLP remarked that "[a]s the DOJ's NPA indicate, a company is unlikely to receive voluntary disclosure credit if the U.S. authorities conclude that it did not make complete and timely disclosure of all relevant issues, even if the company had alerted the DOJ and SEC to some of the potentially improper payments."

## F. Defendants' false statements

98.     On November 23, 2011, after close of trading, PTC filed its 10-K for the fiscal year ended September 30, 2011 (the "2011 10-K") with the SEC. The 2011 10-K was signed by Defendants Heppelmann, Glidden, Grierson, Lacy, and Schechter.

99.     The 2011 10-K also attached as exhibits certifications required pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendants Heppelmann and Glidden, attesting that each (1) "ha[s] reviewed this annual report," that it (2) "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."[10]

100.     The 2011 10-K stated in relevant part:

*We have been investigating certain matters in China, which matters and related remedial actions could have an adverse effect on our business.*

We have been investigating payments by certain Business Partners and expenses by certain employees in China that raise questions of compliance with laws,

---

[10] All SOX Certifications Defendants signed during the Class Period contained substantially identical statements.

including the Foreign Corrupt Practices Act, and/or compliance with our business policies. In connection with this matter, we have terminated certain employees and Business Partners in China, which may have an adverse impact on our level of sales in China until such replacements for those employees and Business Partners are in place and productive. Revenue from China has historically represented 6% to 7% of our total revenue. ***We have voluntarily disclosed the results of our investigation and associated remedial actions to the United States Department of Justice and the Securities and Exchange Commission. We are unable to predict the outcome of these voluntary disclosures, which could include fines or other sanctions.***

101.   This statement was materially misleading because (1) PTC did not self-report in 2008, when it discovered that the COD accounting code was being used for improper payments; (2) PTC did not disclose to the SEC and the DOJ the full results of its FCPA investigation, namely the fact and conclusions of the Earlier Investigations; (3) PTC was not cooperating with the SEC and DOJ's investigations because it was withholding critical information, namely, the fact and findings of the Earlier Investigation. As set out at ¶¶57-61 above, PTC's failure to fully voluntarily disclose all material facts related to its FCPA violations at the time it told DOJ and SEC (and investors) that it was cooperating and self-reporting all facts related to its FCPA violations, materially increased the penalty PTC would have to pay, thus misleading investors as to PTC's potential liability for its FCPA violations.

102.   The 2011 10-K also contained PTC's management's assessment that PTC's internal controls over financial reporting were adequate:

Management's Annual Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act as a process designed by, or under the supervision of, our principal executive and principal financial officers and effected by our board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of our assets;

- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

[…]

Our management assessed the effectiveness of our internal control over financial reporting as of September 30, 2011 using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control-Integrated Framework*. **Based on this assessment and those criteria, our management concluded that, as of September 30, 2011, our internal control over financial reporting was effective.**

[…]

*Change in Internal Control over Financial Reporting*
**There was no change in our internal control over financial reporting** (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the quarter ended September 30, 2011 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

103.   This statement was materially misleading because, as set out above in ¶¶51-56, PTC did not establish adequate internal controls in the period between 2006 and 2011.

104.   The 2011 10-K also claimed that in 2011 PTC had earned net income of $85.42 million. PTC's FCPA violations created a contingent loss, which requires PTC to accrue a charge to net income. Statement of Financial Accounting Standards No. 5 ("FAS 5"), at ¶8. PTC had to recognize an accrual if "[i]nformation available prior to issuance of the financial statements indicates that it is probable that [] a liability had been incurred at the date of the financial statements" and "[t]he amount of loss can be reasonably estimated." *Id.*

105.     As set out at ¶81 above, PTC's base fine could not be less than $11.85 million, the amount of PTC's pecuniary gain. Because PTC did not self-report its misconduct and withheld information from the DOJ, it was reasonably probable that it would receive a fine. The Guidelines "provide a very detailed and predictable structure for calculating penalties for all federal crimes, including violations of the FCPA." Resource Guide, at 68. Further, PTC knew all of the essential facts, including that it had not self-reported or cooperated with the SEC, because it withheld the fact of, and information discovered in, the Earlier Investigations. Accordingly, PTC was required to accrue a loss contingency against its net income of at a minimum, $16.66 million, but did not. *See* ¶88 above.

106.     On November 16, 2012, after close of trading, the Company filed its 10-K for the fiscal year ended September 30, 2012 (the "2012 10-K") with the SEC. The 2012 10-K was signed by Defendants Heppelmann, Glidden, Schechter, Grierson, Lacy, and Bogan. Defendants Heppelmann and Glidden each also executed SOX Certifications certifying the 2012 10-K.

107.     The 2012 10-K stated in relevant part:

> *We have been investigating certain matters in China, which matters and related remedial actions could have an adverse effect on our business and our results.*

> We have been investigating payments and expenses by certain Business Partners and employees in China that raise questions of compliance with laws, including the Foreign Corrupt Practices Act, and/or compliance with our business policies. In connection with this matter, we have terminated certain employees and Business Partners in China, which may have an adverse impact on our level of sales in China until replacements for those employees and Business Partners are in place and productive. Revenue from China has historically represented 6% to 7% of our total revenue. ***We have voluntarily disclosed the results of our investigation and associated remedial actions to the United States Department of Justice and the Securities and Exchange Commission and are continuing to provide additional information as requested by those agencies with respect to this matter. Resolution of this matter could include fines or other sanctions but we are unable to estimate an amount, if any.***

108.     This statement was materially misleading because (1) PTC did not self-report in

2008, when it discovered that the COD accounting code was being used for improper payments;

(2) PTC did not disclose to the SEC and the DOJ the full results of its FCPA investigation, namely

the fact and conclusions of the Earlier Investigations; (3) PTC was not cooperating with the SEC

and DOJ's investigations because it was withholding critical information, namely, the fact and

findings of the Earlier Investigation. As set out at ¶¶57-61 above, PTC's failure to fully voluntarily

disclose all material facts related to its FCPA violations at the time it told DOJ and SEC (and

investors) that it was cooperating and self-reporting all facts related to its FCPA violations,

materially increased the penalty PTC would have to pay, thus misleading investors as to PTC's

potential liability for its FCPA violations.

109.     The 2012 10-K also claimed that in 2012, PTC had incurred a net loss of $35.40

million. PTC's FCPA violations created a contingent loss, which requires PTC to accrue a charge

to net income. FAS 5 at ¶8. PTC had to recognize an accrual if "[i]nformation available prior to

issuance of the financial statements indicates that it is probable that [] a liability had been incurred

at the date of the financial statements" and "[t]he amount of loss can be reasonably estimated." *Id.*

110.     As set out at ¶81 above, PTC's base fine could not be less than $11.85 million, the

amount of PTC's pecuniary gain. Because PTC did not self-report its misconduct and withheld

information from the DOJ, it was reasonably probable that it would receive a fine. The Guidelines

"provide a very detailed and predictable structure for calculating penalties for all federal crimes,

including violations of the FCPA." Resource Guide, at 68. Further, PTC knew all of the essential

facts, including that it had not self-reported or cooperated with the SEC, because it withheld the

fact of, and information discovered in, the Earlier Investigations. Accordingly, PTC was required

to accrue a loss contingency against its net income of, at a minimum, $16.66 million, but did not.

*See* ¶88 above.

111.    On November 22, 2013, after close of trading, PTC filed its 10-K for the fiscal year ended September 30, 2013 (the "2013 10-K"). The 2013 10-K was signed by Defendants Heppelmann, Glidden, Schechter, Lacy, and Bogan. Defendants Heppelmann and Glidden each also executed SOX Certifications certifying the 2013 10-K.

112.    The 2013 10-K stated in relevant part:

> We have been cooperating to provide information to the U.S. Securities and Exchange Commission and the Department of Justice concerning payments and expenses by certain of our Business Partners in China and/or by employees of our Chinese subsidiary that raise questions concerning compliance with laws, including the U.S. Foreign Corrupt Practices Act. Although we have begun discussions with the SEC and Department of Justice regarding possible resolution of this matter, we continue to respond to requests for information and cannot predict when or how this matter may be resolved. Resolution of this matter could include fines and penalties; however we are unable to estimate an amount that could be associated with any resolution and, accordingly, we have not recorded a liability for this matter. If we are required to record a liability for this matter, or to pay fines or penalties associated with this matter, this could materially impact our results for the period in which the liability is recorded or such amounts are paid. Further, any settlement or other resolution of this matter could have collateral effects on our business in China, the United States and elsewhere.

113.    This statement was materially misleading because (1) PTC did not self-report in 2008, when it discovered that the COD accounting code was being used for improper payments; (2) PTC did not disclose to the SEC and the DOJ the full results of its FCPA investigation, namely the fact and conclusions of the Earlier Investigations; (3) PTC was withholding critical information, namely, the fact and findings of the Earlier Investigation, and (4) as a result of (1)-(3), PTC had not been cooperating with the SEC and DOJ and could not expect self-reporting and/or cooperation credit. As set out at ¶¶57-61 above, PTC's failure to fully voluntarily disclose all material facts related to its FCPA violations at the time it told DOJ and SEC (and investors)

that it was cooperating and self-reporting all facts related to its FCPA violations, materially increased the penalty PTC would have to pay, thus misleading investors as to PTC's potential liability for its FCPA violations.

114.    The 2013 10-K also claimed that in 2012, PTC earned net income of $143.77 million. PTC's FCPA violations created a contingent loss, which requires PTC to accrue a charge to net income. FAS 5 at ¶8. PTC had to recognize an accrual if "[i]nformation available prior to issuance of the financial statements indicates that it is probable that [] a liability had been incurred at the date of the financial statements" and "[t]he amount of loss can be reasonably estimated." *Id.*

115.    As set out at ¶81 above, PTC's base fine could not be less than $11.85 million, the amount of PTC's pecuniary gain. Because PTC did not self-report its misconduct and withheld information from the DOJ, it was reasonably probable that it would receive a fine. The Guidelines "provide a very detailed and predictable structure for calculating penalties for all federal crimes, including violations of the FCPA." Resource Guide, at 68. Further, PTC knew all of the essential facts, including that it had not self-reported or cooperated with the SEC, because it withheld the fact of, and information discovered in, the Earlier Investigations. Accordingly, PTC was required to accrue a loss contingency against its net income of, at a minimum, $16.66 million, but did not. *See* ¶88 above.

116.    On November 26, 2014, after close of trading, PTC filed its 10-K for the fiscal year ended September 30, 2014 (the "2014 10-K"). The 2014 10-K was signed by Defendants Heppelmann, Glidden, Schechter, Lacy, and Chaffin. Defendants Heppelmann and Glidden each also executed SOX Certifications certifying the 2014 10-K.

117.    The 2014 10-K stated in relevant part:

We have been cooperating to provide information to the U.S. Securities and Exchange Commission and the Department of Justice concerning payments and expenses by certain of our Business Partners in China and/or by employees of our Chinese subsidiary that raise questions concerning compliance with laws, including the U.S. Foreign Corrupt Practices Act. Our internal review is ongoing and we continue to respond to requests for information from these agencies, including a subpoena issued to the company by the SEC. We cannot predict when or how this matter may be resolved. Resolution of this matter could include fines and penalties; however we are unable to estimate an amount that could be associated with any resolution and, accordingly, we have not recorded a liability for this matter. If resolution of this matter includes substantial fines or penalties, this could materially impact our results for the period in which the associated liability is recorded or such amounts are paid. Further, any settlement or other resolution of this matter could have collateral effects on our business in China, the United States and elsewhere.

118.    This statement was materially misleading because (1) PTC did not self-report in 2008, when it discovered that the COD accounting code was being used for improper payments; (2) PTC did not disclose to the SEC and the DOJ the full results of its FCPA investigation, namely the fact and conclusions of the Earlier Investigations; (3) PTC was withholding critical information, namely, the fact and findings of the Earlier Investigation, and (4) as a result of (1)-(3), PTC had not been cooperating with the SEC and DOJ and could not expect self-reporting and/or cooperation credit. As set out at ¶¶57-61 above, PTC's failure to fully voluntarily disclose all material facts related to its FCPA violations at the time it told DOJ and SEC (and investors) that it was cooperating and self-reporting all facts related to its FCPA violations, materially increased the penalty PTC would have to pay, thus misleading investors as to PTC's potential liability for its FCPA violations.

119.    On April 29, 2015, the Company issued a press release announcing its second quarter 2015 results, stating in relevant part:

*Impact of an Investigation in China*

We have, ***since making a voluntary disclosure to the U.S. Securities and Exchange Commission and the Department of Justice, been cooperating to provide information to those agencies concerning expenditures by certain of our Business Partners in China and by our China business***, including for travel and

entertainment, that apparently benefitted employees of customers regarded as state owned enterprises in China. This matter involves issues regarding compliance with laws, including the U.S. Foreign Corrupt Practices Act. Negotiations with the SEC to reach a resolution of its investigation have begun but have not been concluded. We expect to begin negotiations with the Department of Justice to resolve its investigation in the near future. Resolution of this matter is likely to include fines and penalties. Given the uncertainty regarding whether settlements can be reached and, if reached, on what terms, we are not able to estimate a range of reasonably possible loss with regard to any such settlements and have not recorded any liability in connection with this matter. If settlements are reached, we believe that the associated financial liability could be material to our results of operations for the fiscal period in which the liability is recorded. Further, any settlement or other resolution of this matter could have collateral effects on our business in China, the United States and elsewhere.

120.   This statement was materially misleading because (1) PTC did not self-report in 2008, when it discovered that the COD accounting code was being used for improper payments; (2) PTC did not disclose to the SEC and the DOJ the full results of its FCPA investigation, namely the fact and conclusions of the Earlier Investigations; (3) PTC was not cooperating with the SEC and DOJ's investigations because it was withholding critical information, namely, the fact and findings of the Earlier Investigation. As set out at ¶¶57-61 above, PTC's failure to fully voluntarily disclose all material facts related to its FCPA violations at the time it told DOJ and SEC (and investors) that it was cooperating and self-reporting all facts related to its FCPA violations, materially increased the penalty PTC would have to pay, thus misleading investors as to PTC's potential liability for its FCPA violations.

### G.  Loss causation

121.   On July 9, 2015, after close of trading, the Company issued a press release announcing its preliminary third quarter 2015 results and announcing that it expects to record a minimum liability of approximately $13.6 million in connection with its previously disclosed China investigation, stating in relevant part:

*Other Important Information*

In connection with our ongoing negotiations to resolve previously disclosed investigations by the U.S. Securities & Exchange Commission and the Department of Justice with respect to our China business, we expect to record a liability of approximately $13.6 million in our third quarter financial statements. ***This is the minimum amount of liability we expect to incur if we are able to reach a settlement in this matter, and does not include any amounts associated with potential fines that might be imposed by either or both of the SEC and DOJ, which amounts would increase our liability and could be significant***. Because ***our discussions with the SEC and DOJ are ongoing, the amount of this accrual could increase by the time we release our third quarter results on July 29, 2015.*** Further, there can be no assurance that we will reach a settlement with these agencies or that the cost of such settlements, if reached, would not materially exceed the existing accrual.

122.    Based on PTC's claim that it had voluntarily reported the bribery to SEC and DOJ, that it had acted promptly to remediate the violations, and that the bribery was relatively small and involved only one country, investors were surprised that PTC's payment of $13.6 million was not sufficient to settle the SEC and DOJ's claims – in turn, suggesting that despite PTC's earlier claims minimizing the extent of the FCPA violations and touting its cooperation, PTC would not receive a declination. However, PTC's claim that it might resolve the SEC and DOJ action by the time it released its third quarter results on July 29, 2015 left investors with some hope that the additional penalties might not be substantial.

123.    On this news, shares of PTC fell $2.00 per share or approximately 5% from its previous closing price to close at $38.78 per share on July 10, 2015.

124.    On July 29, 2015, during aftermarket hours the Company issued a press release announcing its third quarter 2015 results and announcing that it recorded a minimum liability of $13.6 million in connection with its previously disclosed China investigation, stating in relevant part:

> Further, our results could be materially adversely affected by the resolution of our previously announced investigation in China. In the third quarter, we recorded a liability of $13.6 million associated with pending discussions with the Securities

and Exchange Commission and the Department of Justice to resolve this matter. This is the minimum amount of liability we expect to incur if we are able to reach a settlement in this matter, and does not include any amounts associated with potential fines that might be imposed by either or both of the SEC and DOJ, which amounts would increase our liability and could be significant. There can be no assurance that we will reach a settlement with these agencies or that the cost of such settlements, if reached, would not materially exceed the existing accrual.

125.   On July 9, PTC had already announced that it would pay the SEC and DOJ at least $13.6 million. Yet on July 29, PTC announced that it was continuing to negotiate the size of the additional penalties and fines that it would pay. It was plain from the negotiation delay that the additional fines PTC would have to pay would be substantial.  Thus, the news alarmed investors.

126.   On this news, shares of PTC fell $1.57 per share or approximately 4% from its previous closing price to close at $36.23 per share on July 30, 2015.

## H. Defendants' false statements were material

127.   According to the SEC's Staff Accounting Bulletin No. 99 ("SAB 99"), a misstatement having an impact of 5% or more on financial statement entries (including net income) is presumptively material.[11]

128.   PTC's FCPA violations created a contingent loss, which requires a charge to net income. FAS 5, at ¶8. And within the accounting profession, it is recognized that a contingency is presumptively material if it would have a 5% or greater impact on net income.[12] Accordingly, PTC's false statements are presumptively material if they result in a greater than 5% impact on net income.

129.   PTC's false statements were presumptively material at all times:

---

[11] That said, it is inappropriate to employ a 5% threshold as a numerical cutoff to find an error immaterial. *See* SEC, Staff Accounting Bulletins, Topic 1: Financial Statements, Section M.

[12] It is appropriate to compare the loss to net income, rather than net income before taxes, because the law prohibits PTC from seeking any tax deduction in connection with the fine. DOJ Settlement, at 4.

|  | Year ended September 30, 2011 | Year ended September 30, 2012 | Year ended September 30, 2013 | Year ended September 30, 2014 | Year ended September 30, 2015 |
|---|---|---|---|---|---|
| PTC net income | $85.42 million | ($35.40 million) | $143.77 million | $160.19 million | $47.56 million |
| Loss from FCPA violation as percentage of net income | 30.6% | 9.1% | 10.1% | 41.1% | 17.0% |
| Potential loss from additional penalty from failure to self-report (minimum guidelines range)[13] | 20.0-35.0% | 5.9-10.4% | 6.6-11.6% | 26.9-47.1% | 11.1-19.5% |

130.    Qualitative factors also determine whether a false statement is material. Appendix B. to Auditing Standard No. 14 provides several qualitative factors to consider in determining whether a statements is materially false. Among them are:

g.   The sensitivity of the circumstances surrounding the misstatement, for example, the implications of misstatements involving fraud and possible illegal acts, violations of contractual provisions, and conflicts of interest. […]

k.   The definitive character of the misstatement, for example, the precision of an error that is objectively determinable as contrasted with a misstatement that unavoidably involves a degree of subjectivity through estimation, allocation, or uncertainty.

l.   The motivation of management with respect to the misstatement, for example, (i) an indication of a possible pattern of bias by management when developing and accumulating accounting estimates or (ii) a misstatement precipitated by management's continued unwillingness to correct weaknesses in the financial reporting process.

---

[13] Source:  ¶88 above.

131.    In this case, the qualitative factors showed that the misstatements were material, as they involved fraud and illegal acts, concerned precise and objectively determinable penalties, and was motivated by management's desire to conceal from the authorities the extent of its wrongdoing by misleading investors about the extent of its misconduct.

132.    Further, PTC's failure to voluntarily report and cooperate made it unlikely that it would receive a declination. PTC would likely be required to admit to facts, risking further prosecution from other governments, and risked even higher penalties, such as a guilty plea and associated collateral consequences.

## V.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

133.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired PTC securities trade on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

134.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PTC securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PTC or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

135.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

136.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

137.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of PTC;

- whether the Individual Defendants caused PTC to issue false and misleading public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;

- whether the prices of PTC securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- the proper measure of damages.

138.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

139.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold PTC securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

- PTC securities are traded in efficient markets, in that:

    o On average, about 4.0% of the Company's shares were traded weekly during the Class Period, permitting a very strong presumption of efficiency;

    o The Company traded on the NASDAQ, a highly automated and efficient market;

    o The Company was covered by at least 10 analysts, who disseminated reports to investors, including analysts from JP Morgan, RBC Capital Markets, Wedbush Securities, Barclays Capital, and Evercore;

    o At least 40 firms made a market in PTC's stock; and

    o At all times during the Class Period, PTC was eligible to file a Registration Statement on Form S-3.

    o News about PTC was rapidly incorporated into its stock price

140.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

141.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v.*

*United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

142.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

143.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

144.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of PTC securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire PTC securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

145.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for PTC securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about PTC's finances and business prospects.

146.    By virtue of their positions at PTC, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

147.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of PTC, the Individual Defendants had knowledge of the details of PTC's internal affairs.

148.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of PTC. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to PTC's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the

aforementioned false and misleading reports, releases and public statements, the market price for PTC's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning PTC's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired PTC securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged upon the revelation of the alleged corrective disclosures.

149.    During the Class Period, PTC's securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of PTC securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of PTC securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of PTC's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

150.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

151.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

152.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

153.    During the Class Period, the Individual Defendants participated in the operation and management of PTC, and conducted and participated, directly and indirectly, in the conduct of PTC's business affairs. Because of their senior positions, they knew the adverse non-public information regarding PTC's business practices.

154.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to PTC's financial condition and results of operations, and to correct promptly any public statements issued by PTC which had become materially false or misleading.

155.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PTC disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause PTC to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of PTC within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PTC securities.

156.     Each of the Individual Defendants, therefore, acted as a controlling person of PTC. By reason of their senior management positions and/or being directors of PTC, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, PTC to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of PTC and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

157.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PTC.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 11, 2016

Respectfully submitted,

/s/ Jason M. Leviton_____
Jason M. Leviton (BBO # 678331)
Joel A. Fleming (BBO # 685285)
Bradley Vettraino (BBO # 691834)
**BLOCK & LEVITON LLP**
155 Federal Street, Suite 400
Boston, MA 02110
Tel.: 617.398.5600
Fax: 617.507.6020
Jason@blockesq.com
Joel@blockesq.com
Bradley@blockesq.com

Liaison Counsel for Plaintiff and Putative Class


**THE ROSEN LAW FIRM, P.A.**

Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Jonathan Horne, Esq.
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: jhorne@rosenlegal.com

Lead Counsel for Plaintiff and the Putative Class

**Certificate of Service**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 11, 2016.

_/s/  Jason M. Leviton